Filed 4/29/14  P. v. Faulkner CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL JAMES FAULKNER,<br><br>Defendant and Appellant. | C073693<br><br>(Super. Ct. No. 12F5298) |

Defendant Michael James Faulkner appeals his convictions for criminal threats and misdemeanor battery.  He contends the trial court prejudicially erred in admitting, over objection, an officer's testimony that the victim was in "sustained fear."  He also contends that the cumulative effect of that error, combined with testimony that suggested defendant was in custody, was prejudicial.  Finding no prejudicial error, we affirm the judgment.

1

## FACTUAL BACKGROUND

On the night of August 4, 2012, defendant's sister, Megan, called 911 and reported her brother had just punched her in her face and choked her. When Megan told defendant she was going to call the police, he ran into the kitchen, then back to Megan's room and tried to stab her. Defendant then "peeled out" of the house in their father's truck. Megan advised the 911 dispatcher her brother left the house with a small kitchen knife, might still be on parole, was on antipsychotic medication, and had been drinking.

Shasta County Deputy Sheriff Jerry Fernandez responded to the scene and met Megan in the driveway. She appeared upset, in fear, and was almost in tears. She was very worried about where defendant was and whether the police could locate him. On her left cheek there was some swelling, bruising, and redness.

Megan reported to Deputy Fernandez that defendant had punched her. When she told defendant she was calling the police, he choked her in a headlock, ripped the phone from her hand and threw it to the ground. She ran and locked herself in a bedroom. Defendant got something from a drawer in the kitchen; she believed he would use that utensil to harm her. Defendant threatened Megan through the door yelling, "Oh you think you're going to send me back to prison? I'll stab that bitch." "I'll stab you if you call nine-one-one because I'm not going back to prison." Defendant then tried to force his way into the room with a knife. Deputy Fernandez observed fresh damage to the bedroom door. The doorjamb was broken and there were nicks in the door which were consistent with someone trying to pry it open with a knife.

Megan reported she called 911 because she was afraid of defendant's threats to stab her. Deputy Fernandez was with Megan for at least 30 minutes. During that entire time, she appeared to remain frightened, upset, worried, and on the verge of tears. She asked what she could do to protect herself from defendant. She asked Deputy Fernandez to try to find defendant so "he wouldn't be out and she would be safe."

2

Megan's sister-in-law, Nicole Faulkner, was also at the scene. Deputy Fernandez interviewed her. Her story largely coincided with Megan's. After the disturbance, Megan ran to the bedroom and defendant ran to the kitchen. He ran toward the bedroom with a large kitchen knife, pounded on the door and yelled, " 'I'll stab that bitch. I'll stab that bitch.' " He then used the knife to try to pry the door open, while Megan was screaming that defendant was trying to stab her.

At trial, Megan was an uncooperative witness and recanted some of her earlier statements. She testified that she and Erica Leeper, her best friend's younger sister, had been at her parent's house on the porch with defendant. She believed defendant was on drugs at the time. He wanted to take Erica to a bar, but Megan told Erica not to go and Megan and defendant argued about that. Defendant and Megan started shoving each other around, and at some point he either pushed, punched, or slapped Megan on the cheek. Defendant blocked her from going into the house and Megan grabbed the phone and threatened to call the police and their parents. Defendant went to the kitchen and Megan thought he was getting something to harm her, so she ran to the bedroom and locked the door. She called the police. Defendant tried to unlock the bedroom door with a small kitchen knife, but did not damage the door. She also testified defendant never threatened to stab or kill her. She told the police he had threatened her so the police would arrest defendant, because he was high on drugs. Megan testified she was afraid defendant would harm her or himself because of his drug use, not because he had threatened her.

Nicole was in the house when one of her children came to her and told her Megan needed her. She opened the door to let Megan in the house. Megan appeared jumpy, frantic, and frustrated. Inside the house, defendant and Megan were yelling at each other. A few minutes later, Megan ran down the hall into the bedroom and defendant ran into the kitchen and came back with a small kitchen knife. Defendant tried to unlock the door with the knife. Megan was "screaming and going crazy" because she was afraid.

3

Erica also testified that defendant got mad at Megan for interfering in their plan to go to the bar. She did not see defendant punch Megan, but saw her fall to the ground while defendant stood in front of her. Megan said she was going to call the police and defendant tried to grab the phone from her. Erica denied that defendant put Megan in a choke hold or "smacked" the phone out of Megan's hand, although she told Deputy Fernandez he had done both.

Erica testified that when Megan got inside the house, she was angry. Defendant ran to the kitchen and Megan ran into the bedroom. Defendant came out of the kitchen with a large white-handled knife. Erica went outside. Defendant came outside with the knife still in his hand, and said, " 'She's trying to call the police and tell them I'm going to stab her.' " Defendant then left in a white truck.

Defendant was arrested later that evening. Deputies did not find a knife in the vehicle. Defendant did not appear to be under the influence of alcohol or drugs. The truck was released to Megan and her husband. Upon picking up the truck, Megan appeared very worried, her voice was shaking and she was trembling and she expressed concern about whether defendant would be released from jail soon.

PROCEDURAL HISTORY

Defendant was charged with criminal threats, battery, and damage of a wireless device. The information further alleged a prior strike conviction and a prior prison term. In addition, the information alleged defendant had committed the charged offenses after having been released from custody on bail or his own recognizance. Following trial, a jury found defendant guilty of criminal threats and battery, and not guilty of damage of a wireless device. In bifurcated proceedings, the trial court found the enhancement allegations true.

After denying defendant's motion to strike his prior conviction and reduce the criminal threats conviction to a misdemeanor, the trial court sentenced defendant to the upper term of three years on the criminal threats conviction, doubled to six years because

4

of the prior strike conviction, plus five years for the serious felony enhancement, and one year for the prior prison term enhancement.[1]  The trial court also sentenced defendant to a concurrent six-month term on the misdemeanor battery conviction.

DISCUSSION

I

*Testimony As To "Sustained Fear"*

Defendant contends the trial court erred in admitting into evidence Deputy Fernandez's testimony that Megan was in " 'sustained fear.' "  He contends this testimony was improper opinion testimony.  He argues that sustained fear is an element of the offense, the requisite mental state of the victim, and police officers may not testify as to another person's state of mind.  He also contends Deputy Fernandez's testimony was an opinion on the ultimate fact of defendant's guilt.

On direct examination, Deputy Fernandez testified regarding Megan's physical demeanor the night of the incident.

"[PROSECUTOR]:  Can you tell us -- tell the jury [Megan]'s physical demeanor when you first saw her that night?

"[FERNANDEZ]:  Um, almost to the point of tears.  She was definitely upset.  Really worried about what the defendant was -- where he was, if we would locate him.  I would suggest sustained fear.

"[DEFENSE COUNSEL]:  I object to that last comment, your Honor.  Lack of foundation and speculative.  It is an opinion.  I'll move to strike it.  Ask the Court to admonish the jury to disregard it.

"THE COURT:  Overruled.  That is within the ability of the percipient witness to evaluate, in my opinion.  So I'll allow it."

---

**1**    The trial court found the on-bail enhancement true, but noted defendant could not be punished for the enhancement unless he were convicted in that underlying charge.

5

The testimony continued,

"[PROSECUTOR]: From the time you first arrived at the location . . . and met with [Megan] -- when you first arrived, did she have that physical manifestation that you described? Almost in tears-type of fear when you first got there?

"[FERNANDEZ]: Yes.

"[PROSECUTOR]: How long did you remain at that location when you first began investigating this case?

"[¶] . . . [¶]

"[FERNANDEZ]: No less than 30 minutes.

"[PROSECUTOR]: And in the time you were at that location, did [Megan] remain, as well?

"[FERNANDEZ]: Yes, she did.

"[PROSECUTOR]: Did you have continued interaction with her during that portion of your investigation?

"[FERNANDEZ]: Yes.

"[PROSECUTOR]: During that time, did it appear that her physical fear -- the manifestation of her fear lessened at all while you were there?

"[FERNANDEZ]: No.

"[PROSECUTOR]: She remained scared the whole time?

"[FERNANDEZ]: Yes.

"[PROSECUTOR]: While you are there, did she ask you in any way if there is anything that you could do to protect her and her family from the defendant?

"[FERNANDEZ]: Yes, she did.

"[PROSECUTOR]: What did she say?

"[FERNANDEZ]: She asked lots of questions. Due to there being family there -- sister-in-law, sister's friend, the manner in which the incident occurred, um, she was pretty fearful. She did not want to leave her sister-in-law there, her friend there. [¶] [S]o

6

I informed her of all her courses of action that she could do, such as -- well you know, maybe you can go home. That wasn't an option because her sister-in-law was still there. She didn't want [defendant] to come back and her be there by herself.

"[¶] . . . [¶]

"[PROSECUTOR]: And after her husband arrived, did [Megan]'s -- the physical manifestations of her fear change or lessen at all?

"[FERNANDEZ]: No.

"[PROSECUTOR]: She remained afraid even when her husband showed up?

"[FERNANDEZ]: Yes.

"[PROSECUTOR]: And did she ask you to try to find the defendant so he wouldn't be out and she would be safe?

"[FERNANDEZ]: Yes."

During a discussion outside the presence of the jury, the court stated "the Defense objected to the People inquiring of the current witness of his opinion concerning whether the victim was in fear when he interviewed her. That objection was overruled because the current witness testified about indicia that led him to that opinion. Physical indicia . . . of the victim and the surrounding circumstances. And it is well within the ability of a percipient witness to render such an opinion. [¶] I do note, however, the opinion testimony instruction 333 is not included in the People's instructions and that should be included. And that very adequately explains how the jury can deal with such opinion testimony."

The trial court instructed the jury, "Witnesses who were not testifying as experts gave their opinions during the trial. You may but are not required to accept those opinions as true or correct. You may give the opinions whatever weight you think appropriate. Consider the extent of the witness's opportunity to perceive the matters on which his or her opinion is based, the reasons the witness gave for any opinion and the facts or information on which the witness relied in forming that opinion. You must

7

decide whether anything on which the witness relied was true and accurate. You may disregard all or any part of an opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

"One of the fundamental theories of the law of evidence is that witnesses must ordinarily testify to facts, not opinions. [Citation.] An exception exists for expert witnesses. (Evid. Code, § 801.) In addition, nonexperts are allowed to state opinions in limited situations. (Evid. Code, § 800.)" (*People v. Williams* (1992) 3 Cal.App.4th 1326, 1332.) Under Evidence Code section 800, "If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony."

"Lay opinion testimony is admissible where no particular scientific knowledge is required, or as 'a matter of practical necessity when the matters . . . observed are too complex or too subtle to enable [the witness] accurately to convey them to court or jury in any other manner.' [Citations.]" (*People v. Williams* (1988) 44 Cal.3d 883, 915.)

"Generally, a lay witness may not give an opinion about another's state of mind. However, a witness may testify about objective behavior and describe behavior as being consistent with a state of mind." (*People v. Chatman* (2006) 38 Cal.4th 344, 397.) This is so even if the testimony thereby touches on the ultimate issue in a case, "but only where 'helpful to a clear understanding of his testimony' [citation], i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed. [Citations.]" (*People v. Melton* (1988) 44 Cal.3d 713, 744.) Admission of lay opinion testimony is within the trial court's discretion. (*People v. Mixon* (1982) 129 Cal.App.3d 118, 127.)

Here, it is a close question, but we need not resolve it because even if there was error, the error was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. McNeal* (2009) 46 Cal.4th 1183, 1188, 1203.) There was ample evidence of Megan's

8

fear and its extent. Nicole testified Megan was screaming and "going crazy" because she was so afraid of defendant. The jury heard Megan's 911 call and the tone of her voice five minutes after defendant left the property. Deputy Fernandez testified as to Megan's appearance, demeanor, and behavior; the physical manifestations of her fear. When he arrived at the scene 15 to 20 minutes after the 911 call, Megan appeared to be in fear, she was "definitely upset" "almost to the point of tears." Deputy Fernandez was with her for at least 30 minutes and during that entire time, those physical manifestations of fear did not lessen. Megan told Deputy Fernandez she was afraid her brother was going to stab her. She also asked Deputy Fernandez to find defendant so she would be safe. The evidence reflects Megan was in fear from defendant's threat for at least one hour after defendant left the property. Although not defined in Penal Code section 422, the term "sustained fear" has been defined by case law as "a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156; *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1140; *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349; CALCRIM No. 1300.) The evidence strongly supports the conclusion Megan was in sustained fear. Based on this record, it is not reasonably probable that the result would have been different in the absence of any error in admitting Deputy Fernandez's opinion testimony. (*Watson,* at p. 836.)

II

*Cumulative Error*

Defendant next contends the cumulative effect of the errors of denying defendant's motion for a mistrial after Nicole's testimony about visiting defendant and in admitting Deputy Fernandez's testimony was prejudicial.[2] Defendant claims Nicole's

---

[2]    Defendant complains about the admission of Nicole's testimony, but it is not entirely clear on what legal basis he is claiming error, as defendant does not make a separate argument as to the error itself. Defendant did not object to the testimony or

9

testimony made clear that defendant was in custody during the trial, the jurors would then reasonably believe defendant was too dangerous to be released, and more readily believe he committed the acts with which he was charged.

During Nicole's testimony, the following exchange occurred:

"[PROSECUTOR]: In fact, after the defendant was arrested for what he did on August 4, you visited him twice, right?

"[NICOLE]: Yes, I did.

"[PROSECUTOR]: You visited him even most recently on the 14th of this month for 45 minutes; isn't that right?

"[NICOLE]: Yes, I did.

"[PROSECUTOR]: Discussed his case with him?

"[NICOLE]: No, not really. No, not in particular.

"[PROSECUTOR]: And in September, you visited him. That would be on the 2nd of September. You went in and visited him for 20 minutes; isn't that right?

"[NICOLE]: Yes, I did."

At that point in the examination, the trial court interrupted and held proceedings outside the presence of the jury. The trial court advised Nicole the jury was unaware defendant was in custody and to be sure she did not inadvertently provide testimony that would inform the jury of that fact.

Defense counsel made a motion for mistrial based on prosecutorial misconduct. He argued the obvious inference of the prosecutor's questioning, with specific dates and times of visits, "is that [defendant] was in custody on [those dates] and that he's in custody now, which is something that shouldn't be before this jury." The trial court replied, "I disagree that it is an obvious inference that the defendant is in custody. He

---

questioning. Defendant did make a motion for mistrial which the trial court denied. Accordingly, that is the ruling we review on appeal.

10

was -- [the prosecutor] asked questions about these visits. Like yourself, I became concerned that we were going to start talking about jail time. That's why I called a recess and brought you both up to the bench . . . . [¶] Obviously, the defendant is in civilian clothing, there's no indication he's in custody. And reference has not been made to him having been in custody."

"We review a trial court's ruling on a motion for mistrial for abuse of discretion. [Citation.] Such a motion should only be granted when a defendant's 'chances of receiving a fair trial have been irreparably damaged.' " (*People v. Valdez* (2004) 32 Cal.4th 73, 128.) We see no abuse of discretion here.

Some references to a defendant's custodial status can impair the presumption of innocence, violating his or her rights to due process and a fair trial. (*Estelle v. Williams* (1976) 425 U.S. 501 [48 L.Ed.2d 126]; *People v. Bradford* (1997) 15 Cal.4th 1229.) In *Bradford*, the prosecutor questioned a witness during direct examination about her continued friendship with defendant in an attempt to reveal bias. (*Bradford,* at p. 1335.) He asked whether she had given the defendant anything in the last month, to which she replied, " 'Like what can I give him, writing paper?' " (*Ibid*.) The California Supreme Court rejected the claim of misconduct, as "[t]he prosecutor did not refer expressly to the circumstance that defendant was in custody in questioning [the witness] concerning her continuing ties to defendant, and, as the trial court found, the single, spontaneous comment made by [the witness] did not necessarily raise the inference that defendant was in fact in custody. Even if it had, however, an isolated comment that a defendant is in custody simply does not create the potential for the impairment of the presumption of innocence that might arise were such information *repeatedly* conveyed to the jury." (*Bradford,* at p. 1336.)

Here, as noted by the trial court, there was no express reference to defendant's custodial status, defendant remained in civilian clothing and there were no other indications he was in custody. We are not persuaded that the jury would have necessarily

11

construed the prosecutor's questions to mean that defendant was in custody. Nonetheless, to the extent the questions did raise that inference, it was just an inference, and a comparatively minor one when taken in the context of the strong evidence of defendant's guilt. As with the isolated comment in *Bradford,* this inference did not irreparably damage defendant's chance of receiving a fair trial.

Based on our conclusion that there was no error in the denial of the motion for a mistrial, we also reject defendant's claim of cumulative error. "We have considered each claim on the merits, and neither singly nor cumulatively do they establish prejudice requiring the reversal of the convictions." (*People v. Lucas* (1995) 12 Cal.4th 415, 476.)

## DISPOSITION

The judgment is affirmed.


　　　　　　　　　　　　　　　　　　　　　　ROBIE　　　　　　　, J.



We concur:



　　　NICHOLSON　　　, Acting P. J.



　　　MAURO　　　　, J.